Kirk v. Hitchcock                    CV-98-700-M    09/29/00
                UNITED STATES DISTRICT COURT

                 DISTRICT OF NEW HAMPSHIRE


Eileen Kirk, M.D.,
     Plaintiff

     v.                                Civil No. 98-700-M
                                       Opinion No. 2000 DNH 203
The Hitchcock Clinic, Mary
Hitchcock Memorial Hospital,
Dartmouth Hitchcock Medical
Center, Dartmouth College,
Dartmouth Medical School,
Lisabeth Maloney, Barry Smith,
Thomas Colacchio, and Ellen Hubbell,
     Defendants


                      **O R D E R**


     Eileen Kirk, M.D. (Kirk), brings this action against her

former employer, The Hitchcock Clinic, as well as Mary Hitchcock

Memorial Hospital, Dartmouth Hitchcock Medical Center, Dartmouth

College, Dartmouth Medical School, and three physicians (Maloney,

Smith, and Colacchio) and a nurse (Hubbell) with whom she worked

(collectively Defendants), seeking relief for alleged gender

discrimination in violation of Title VII of the Civil Rights Act

of 1964 (Title VII).  See 42 U.S.C. § 2000e, et seq.  She also

asserts common law claims of defamation, interference with

advantageous business relations, and wrongful discharge. Defendants have moved for summary judgment on all claims. Plaintiff objects. The motion is granted in part and denied in part.

## Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party carries its burden, the burden shifts to the

nonmoving party to demonstrate, with regard to each issue on which it has the burden of proof, that a trier of fact could reasonably find in its favor. See DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997).

At this stage, the nonmoving party "may not rest upon mere allegation or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue" of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial. Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).


## Factual Background

Kirk, a medical doctor, began working for the Hitchcock Clinic (Clinic) in September of 1992 in the Department of

Obstetrics and Gynecology (OB/GYN). Her position was accompanied by appointments to the medical staff of Mary Hitchcock Memorial Hospital and Dartmouth Medical School, contingent upon her continued employment at the Clinic. As a standard condition of her employment, Kirk received annual reviews based, in part, on assessments by Clinic staff of her professional performance during the previous year. She became eligible for "voting membership" in the Clinic in October of 1997. Voting membership is essentially a permanent position equivalent to tenure in an academic institution. Kirk was reappointed to her position in 1993, 1994, 1995, and 1996. On October 23, 1997, however, the Clinic's Board of Governors voted 23-0 to deny her voting membership and to terminate her employment. At the time Kirk was terminated, she maintained one of the largest OB/GYN practices at the Clinic and was the only full-time female OB/GYN generalist.

For purposes of these proceedings Kirk's employment with the Clinic was uneventful before 1994. In the fall of 1994 medical complications arose during a birth for which Kirk was responsible, resulting in brain damage to the baby. She investigated possible causes of the unfortunate occurrence and,

4

by the spring of 1995, she began reporting concerns about violations of practice standards, rules, and regulations promulgated by various health care organizations occurring within the Clinic's labor and delivery ward (the Birthing Pavilion). Her concerns related to issues of quality improvement, quality assessment, quality assurance, quality assurance/improvement monitoring, nurse staffing, nurse competency, and various standards relating to the medical staff, nursing leadership, administration, and governing body ("quality assurance concerns"). During the period between 1995 and Kirk's termination in 1997, she continued to raise quality assurance concerns within the Birthing Pavilion and continually requested an external review of its operation.

Sometime in 1996, the Clinic entered into negotiations with the Alice Peck Day Hospital (APD) to provide APD with obstetrical services. Kirk became aware of these negotiations in the summer of 1996 and, because she felt she was making little progress in resolving what she perceived to be legitimate patient care issues within the Birthing Pavilion, she requested assignment to APD. Dr. John Currie (Currie), who served as the Clinic's chairman of

5

the OB/GYN department, and was responsible for assigning Clinic doctors to APD, refused to send Kirk because "she was a woman."[1]

Kirk reported Currie's comment to Maloney, the Medical Director, who in turn contacted Mary Childers (Childers), then responsible for equal opportunity matters at Dartmouth College, and requested an internal investigation. Based on her investigation, Childers concluded that Currie's remark did not evidence discriminatory treatment but represented a business decision.[2] Childers reported her preliminary conclusions to Kirk. At some point, Kirk was informed that if she desired, she could file a formal written complaint which would be investigated by the Clinic's Human Resources Department.

On August 21, 1996, Kirk was told by Colacchio that her annual appointment was being challenged due to the environment in labor and delivery which he attributed to Kirk. On September 3,

---

[1]The record is not clear as to the exact words Currie used but "because 'she was a woman'" is the language cited by Kirk and therefore will be accepted for purposes of this motion. See Pl. Opp. to Summary Judgment at 5.

[2]Childers likened Currie's decision to that of selecting women to teach female physical education classes. That is, the Clinic had a business reason for retaining Kirk (and her large OB/GYN practice) at the Clinic.

Childers sent an email to Maloney, Colacchio, and Currie suggesting that failure to reappoint Kirk could result in her filing a lawsuit. On September 6, 1996, while Kirk was attending a conference in Washington, D.C., Maloney telephoned her and informed her that there had been a meeting among risk management and several administrators related to her upcoming reappointment. Kirk was told that it had been determined that, as a condition of reappointment, she would be required to sign a statement agreeing to several things, including: the appropriate methods for dealing with quality assurance issues within the Birthing Pavilion; mediation with one of the nurses with whom Kirk had recurring difficulties; and a promise to either refrain from accusing Currie of gender discrimination or to file a formal written complaint. Four days later, Maloney phoned Kirk again and reversed course – she told her she did not have to sign anything, but she still wanted her to submit a complaint in writing to Childers if she wished to pursue a sexual discrimination claim. Kirk never filed a complaint. Kirk was reappointed on September 12, 1996.

7

Over the course of the following year, Kirk continued to raise issues of quality assurance within the Birthing Pavilion. She also discussed with the Joint Commission on Accreditation of Health Care Organizations the possibility of an external review. In October of 1997,[3] some difficulties arose with regard to the care of a newborn. Kirk believed that the child's records had been altered and notified risk management. A short time later Kirk was denied voting membership in the Clinic. The stated reason for the denial was "lack of collegiality." Kirk appealed her termination through an internal appeals process, but the termination was upheld. Kirk has also appealed her termination to the New Hampshire Department of Labor under the state's "Whistleblowers Act."

## Discussion

Plaintiff alleges violations of Title VII in the form of discrimination, hostile work environment, retaliation, and

---

[3]Kirk's Opposition to Summary Judgment places this event in "October 1996." However, based on other evidence in the record, that is apparently a typographically error.

8

disparate treatment. Defendants move for summary judgment with respect to the Title VII claims on the following grounds:

> [1.] . . . individuals may not be held liable under Title VII;
> [2.] . . . [Kirk] has failed to make out a prima facie case for sex discrimination;
> [3.] . . . there is no evidence the alleged harassment related to gender;
> [4.] . . . there is no evidence that Kirk's complaining about Dr. Currie's alleged remark caused her to be denied voting membership 17 months later.

Def. Motion for Summary Judgment at 4 (document no. 13). Defendants additionally argue that Kirk's sexual discrimination claim, based on Currie's asserted reason for not assigning her to APD, is time-barred. See Def. Reply at 5 (document no. 57).

Kirk says in her Objection to Defendants' motion that she has not sued anyone in a personal capacity. Accordingly, that issue will not be addressed. See Pl. Mem. in Support of Opp'n at 2 (document no. 46). Each of Kirk's Title VII claims are addressed below.

Defendants' argument with respect to the hostile work environment claim can be disposed of quickly, so will be addressed first. The remaining Title VII claims overlap in some aspects, and will be discussed together.

9

Hostile Work Environment

To maintain a hostile work environment claim under Title VII, a plaintiff must demonstrate that the harassment was based on sex. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66-73 (1986); Brown v. Hot, Sexy and Safer Productions, 68 F.3d 525, 540 (1st Cir. 1995). As discussed below, a "review of the record in the light most hospitable to the party opposing summary judgment," demonstrates that Kirk has failed to provide evidence establishing this fundamental element. See Griggs-Ryan, 904 F.2d at 115.

Kirk maintains she was subjected to a hostile work environment by the nurses with whom she worked in the Birthing Pavilion. In order to avoid summary judgment, however, she must do more that "rest on mere allegations. . . ." DeNovellis v. Shalala, 124 F. 3d at 306. She must support her allegations with evidence, such as depositions, answers to interrogatories, admissions on file, and affidavits. Fed. R. Civ. P. 56(c). Kirk's only offer of proof that the hostile environment was "based on sex" is that others overheard Currie's remark in response to her request to be assigned to APD. See Pl. Sur-Reply

10

at 5 (document no. 61).  That fact is not evidence tending to show that the alleged hostility of nurses was related to her gender, or even to Currie's remark.  On the contrary, as Defendants point out, Kirk's own deposition testimony contradicts her allegation that the allegedly hostile environment was based on sex:

> Q:    Well, is it your contention that the group that is hostile to you is because you were a woman, is that your contention?
>
> A:    No, they were hostile because I had raised issues and blown their confidences with regards to things they had said about the Klonosky case, things they had said about Ellen Hubbell.  They were close confidants and friends of mine.  And they saw the bad care the patients were getting; and when I stood up, they had to disassociate themselves.  I don't think they wanted to put their job in jeopardy.

Def. Ex. in Support of Motion for Summary Judgment, 1:B, Kirk Depo. 2:33.  Furthermore, Kirk states in her Complaint that "[t]ransferring to [APD] would have allowed Dr. Kirk to be removed from the hostile environment which had been created by nursing personnel under Hubbell's supervision and at Hubbell's direction," thereby conceding the so-called hostile work environment pre-dated the APD incident.  See Complaint ¶ 14 (document no. 1).  Because an issue must be supported by evidence

11

in order to be "genuine," and the only record evidence concerning the alleged hostile work environment is Kirk's own words asserting the hostility stemmed from her complaints about patient care and issues other than gender, Kirk has not demonstrated a triable issue on her hostile environment claim.  See DeNovellis v. Shalala, 124 F. 3d at 306.


Remaining Title VII Claims

Kirk contends that summary judgment should be denied because she has asserted a colorable claim under Title VII.  Pl. Mem. in Opp'n at 25 (document no. 46).  The structure of her argument seems to be as follows.  Kirk was subjected to a discriminatory act in the summer of 1996.  She reported the incident to her employer.  She was reappointed in September 1996, because her employer feared she would file "a law suit in which the sex discrimination charge is an opportunity for redressing issues unrelated to it." Pl. Sur-Reply, Ex. G (email from Childers to Maloney, Colacchio, and Currie) (document no. 61).  This influence on her 1996 reappointment, Kirk's argument goes, is evidence that her termination in 1997 was, at least in part, in

12

retaliation for making a sexual discrimination claim. Additionally, she was subjected to sexual discrimination in the form of disparate treatment when she was terminated for "non-collegiality" because her male counterparts have retained their jobs notwithstanding their own allegedly non-collegial acts.

Defendants respond by contending that any sexual discrimination claim with respect to APD is time barred; Kirk's termination was not in retaliation for her sexual discrimination complaint, but rather was based on her lack of collegiality arising from her approach to addressing quality assurance issues within the Birthing Pavilion as well as her inability to work with others in her department; and, Kirk has not presented any evidence supporting a claim of disparate treatment. Based on the record, Defendants are correct.

1. <u>The APD Incident</u>

Before a plaintiff may bring suit based on sexual discrimination in federal court, charges must first be filed with the Equal Employment Opportunity Commission (EEOC) within 180 days of the discriminatory act (unless the charge is first filed

with an authorized state agency, in which case it must be filed with the EEOC within 300 days).  See 42 U.S.C.A. § 2000e-5(e); Kelley v. School Administration Unit #54, No. 98-439-M, slip op. at 11 (D.N.H. July 22, 1999).  New Hampshire is a deferral state, in which a claimant enjoys the benefit of the full 300-day filing period, and may file with either the EEOC or the New Hampshire Commission for Human Rights (NHCHR) within that period.  See Kelley, No. 98-439-M, slip op. at 11.

In this case, the APD incident occurred in the summer of 1996.[4]  Kirk filed her claim with NHCHR in July of 1998, obviously more than 300 days later.

Kirk's explanation for the delay is that she was afraid she would lose her job if she filed earlier.  Whether that explanation is plausible or not, however, the applicable time limit may only be tolled in exceptional circumstances.  See Bonilla v. Muebles J.J. Alvarez Inc., 194 F.3d 275, 279 (1st Cir. 1999).  Generally, exceptional circumstances are ones "effectively beyond [the plaintiff's] control," such as being

---

[4]Kirk's personal notes indicate the comment occurred on May 14, 1996.

14

actively misled by the employer, followed by reliance to plaintiff's detriment. <u>Id.</u> Even accepting Kirk's explanation as true, failing to file out of fear of retaliatory action is not an exceptional circumstance beyond her control, particularly since Title VII provides specific remedies for retaliation. Therefore, Kirk has not put forth a sufficient basis for tolling the filing deadline, and any claim of discrimination based on Currie's refusal to assign Kirk to APD "because she is a woman" is time-barred.

Kirk also argues that her discrimination claim should not be time-barred because she "filed this claim as part of a pattern of on-going discrimination" and, therefore, the clock did not start running until her termination in October 1997, thus her complaint was filed with NHCHR within the 300-day period. Pl. Sur-Reply. in Opp'n at 5 (document no. 61). She defines the "pattern of on-going discrimination" as follows:

> Based upon the Defendant[s'] internal correspondence, it is apparent the Plaintiff['s] Fourth reappointment was due to the Defendants' fear of the repercussions if they failed to reappoint her. It is equally clear, the Defendants were waiting for an opportunity the following year to terminate the Plaintiff, which they did. . . .Because this adverse employment action was taken, in a large part, due to her internal attempt to

15

assert her remedies under Title VII, the statute of limitations did not begin to "run" until the date her termination was final.

Pl. Sur-Reply at 5-6.

The First Circuit has recognized two types of on-going patterns of discrimination: serial violations and systemic violations.  See Sabree v. United Bhd. of Carpenters and Joiners, 921 F.2d 396, 400 (1st Cir. 1990).  Kirk's argument for a "pattern of on-going discrimination" indicates she is alleging a serial violation, as opposed to a systemic violation (in which she would be alleging the Clinic employed a general discriminatory practice or policy applicable to others as well).  See Jensen v. Frank, 912 F.2d 517, 523 (1st Cir. 1990).  Moreover, there is no record evidence supporting a claim of systematic violation.

Serial violations involve recurring acts of the same type of discrimination.  See Smith v. Bath Iron Works Corp., 943 F.2d 164, 166 (1st Cir. 1990).  Kirk bases her claim of an "on-going pattern of discrimination" on the fact that she was told she couldn't move to APD because she was a woman and was terminated over a year later, allegedly because she complained about

16

Currie's remark. Kirk's complaint does not describe recurring acts of the same type of discrimination. See id. Rather, she describes two discrete incidents of alleged violations of Title VII. Accordingly, there is no basis upon which to posit a serial violation, and extend the time period applicable to filing a complaint related to the APD incident.

2. Retaliation

Kirk alleges she was terminated "in large part" because she reported an incident of sexual discrimination. Defendants contend that she was not reappointed, and not granted voting membership, because she did not practice medicine in a sufficiently collegial manner – a decision based on her approach to resolving quality assurance issues and the negative effect her approach had on the staff of the Clinic. Defendants' position is supported by evidence in the record.

Whether Kirk's retaliation claim is analyzed under the mixed motive approach or the pretext approach, the result is the same. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Fernandes v. Costa Brothers Masonry, Inc., 199 F.3d 572, 580-83

17

(1st Cir. 1999) (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 241-42 (1989)[5]).  Under the mixed motive approach, Defendants have asserted a non-Title VII protected reason for terminating Kirk.  See Fernandes, 199 F.3d at 580-83; see also Tanca v. Nordberg, 98 F.3d 680, 684-85 (1st Cir. 1996) ("the mixed motive provisions of section 107 of the 1991 [Civil Rights Act] do not apply to Title VII retaliation claims brought under section 2000e-3" thus "the Price Waterhouse rule continues to apply to mixed motive retaliation claims").  Even if the fact that she reported the APD incident in the summer of 1996 played a role in Defendants' decision to terminate her, the fact that they had another adequate and non-discriminatory reason to terminate relieves them of Title VII liability under a retaliation claim. See Tanca, 98 F.3d at 684-85.

---

[5]Price Waterhouse has been superceded by statute to the extent that employers cannot escape Title VII liability by showing the same discriminatory action would have been taken regardless of the discriminatory motive.  See Civil Rights Act of 1991, Public Law No. 102-166, § 107, 105 Stat. 1071, 1075 (1991). However, the First Circuit has concluded that, based on the plain language of the statute, § 107 does not apply to retaliation claims, and therefore is irrelevant to this analysis.  See Tanca v. Nordberg, 98 F.3d 680, 684 (1st Cir. 1996).

18

Similarly, Kirk has not provided sufficient evidence to suggest Defendants' proffered reason for her termination was actually a pretext for a discriminatory discharge.[6] <u>See McDonnell Douglas Corp. v. Green</u>, 411 U.S. at 802. Viewing the facts in the light most favorable to plaintiff, the record is replete with evidence, including statements made by Kirk herself, that Kirk's professional approach to resolving quality assurance issues was indeed creating difficulties among her colleagues at the Clinic. The burden thus shifts back to Kirk to show Defendants' proffered reason for termination was pretextual. Kirk attempts to meet that burden in two ways: (1) she offers letters and testimony casting her in a good light, to refute the conclusion that she behaved in a non-collegial manner, and (2) she claims she was the victim of disparate treatment. This is not enough. The disparate treatment claim is discussed below, but the testimonials are insufficient to establish Defendants' proffered reason for termination as pretextual. <u>See King v. Town</u>

[6]The court notes that, at this juncture, its acceptance of Defendants' reason for terminating Kirk is only for the purposes of determining whether Title VII has been violated. This conclusion has no bearing on Kirk's state actions for wrongful discharge.

19

of Hanover, 116 F.3d 965, 968 (1st Cir. 1997) ("Although King produced depositions and affidavits of witnesses to challenge the appropriateness of the disciplinary action, this evidence contesting the factual underpinnings of the reasons for the discipline, without more, is insufficient to present a jury question regarding the retaliation claim").

3.    Disparate Treatment

Like retaliation, disparate treatment is subject to pretext analysis.  See Conward v. Cambridge School Committee, 171 F.3d 12, 19 (1st Cir. 1999).  To survive summary judgment on a disparate treatment claim, plaintiff must show that "others similarly situated to [her] in all relevant respects were treated differently by the employer."  Conward, 171 F.3d at 19.  Kirk attempts to do this in her Opposition to Summary Judgment by recounting several instances in which male colleagues apparently acted "non-collegially" but retained their jobs.  Pl. Mem. in Opp'n at 20-21 (document no. 46).  However, these allegations

20

wholly rest on hearsay accounts of her colleagues' behavior,[7] and thus are not sufficient to establish a genuine issue of material fact for the purposes of summary judgment. See <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 50 (1st Cir. 1990). Therefore, since, as explained above, Defendants have put forth a supported non-discriminatory reason for Kirk's termination, and Kirk has failed to point to evidence in the record establishing a genuine issue

---

[7]Kirk cites three sources in support of her disparate treatment allegation: her own deposition testimony, the "Currie Chronology," and an affidavit of Susan Stefan, M.D. A search of Kirk's documents, however, does not turn up the cited pages to her deposition, or the Stefan affidavit. A review of the few applicable pages available in Defendants' attachments reveals that her deposition testimony consists of the same hearsay accounts of alleged conduct by her male colleagues. Def. Ex. in Support of Motion for Summary Judgment 1:B (with document no. 13). While other documents in the record suggest the "Currie Chronology" might be classified as an exception to the hearsay rule, see Fed. R. Ev. 803(5), there is no mention of her male counterparts' conduct in the document. Thus it offers no support for Kirk's allegation that her male counterparts engaged in similar conduct as she but were not disciplined.

Furthermore, although referenced, the Stefan affidavit is not part of the record. Kirk attempts to get around these difficulties by claiming Defendants are in possession of the documents necessary to prove her disparate treatment allegation. But Kirk has not filed a motion to compel production of the documents, nor has she filed a motion under Fed. R. Civ. P. 56(f) requesting this court to refuse to consider Defendants' Motion for Summary Judgment or, in the alternative, grant a continuance.

of fact as to whether the stated reason is pretextual, Kirk has not met her burden and cannot avoid summary judgment.

Conclusion

Kirk has not presented evidence on any of her Title VII claims sufficient to establish a genuine issue of material fact. For that reason, Defendants' Motion for Summary Judgment (document no. 13) with respect to the Title VII claims is granted.

As for Kirk's remaining state law claims, the court declines to exercise its supplemental jurisdiction. See generally, Camelio v. American Federation, 137 F.3d 666 (1st Cir. 1998). Accordingly, those claims are dismissed without prejudice to refiling in state court.

The Clerk shall enter judgment in accordance with the terms of this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 29, 2000

cc:   Nancy S. Tierney, Esq.
      William L. Chapman, Esq.
      Kevin P. Light, Esq.